IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

VICTOR M. JAVITCH, RECEIVER,

                Plaintiff,                Case No. 3:03 CV 7433

  -vs-

                                                  MEMORANDUM OPINION

TRANSAMERICA OCCIDENTAL
LIFE INSURANCE CO.,

                Defendant.

KATZ, J.

This matter is before the Court on Defendant's motion to dismiss, Plaintiff's response and Defendant's reply thereto. For the reasons stated below, Defendant's motion will be denied.

### BACKGROUND

This action is related to a pending viatical insurance case which has spawned its own universe of civil litigation and resulted in multiple criminal convictions for the principals therein. *See Liberte v. Capwill*, 229 F.Supp.2d 799 (N.D. Ohio 2002). In that case Liberte Capital Group ("Liberte") and Alpha Capital Group ("Alpha") charged that James A. Capwill ("Capwill"), through the entities Viatical Escrow Services, LLC ("VES") and Capital Fund Leasing ("CFL"), unlawfully diverted investor funds escrowed for insurance premiums or awaiting placement in viatical contracts. The Court-appointed General Receiver, Victor M. Javitch[1] ("Javitch"),

---

[1] Initially Frederick M. Luper was appointed Receiver on July 15, 1999; however, effective July 26, 2000, Javitch replaced Luper in that capacity. On August 3, 2004, pursuant to a Court order,
(continued...)

initiated suits against agents, brokers, brokerage houses, banks and various insurers all with an eye towards marshalling assets on behalf of the investors, the ultimate victims in this debacle.

In the above-captioned action, the Plaintiff seeks a declaratory judgment and rescission of eleven life insurance policies issued by Defendant Transamerica Occidental Life Insurance Company ("Transamerica"). The Plaintiff requests the policies be declared void *ab initio* and demands return of premiums paid including interest thereon. Transamerica moves for dismissal pursuant to Fed. R. Civ. P. 12(b)(6) on the basis that: (1) the Receiver is without standing to assert the claims; (2) the Receiver may not raise the issue of a lack of insurable interest; (3) the claim for unjust enrichment must fail as a matter of law; and (4) the fraudulent conduct of Liberte and others precludes recovery of premiums.

## DEFENDANT'S MOTION TO DISMISS

*1. Standard Under 12(b)(6).*

In deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the function of the Court is to test the legal sufficiency of the complaint. In scrutinizing the complaint, the Court is required to accept the allegations stated in the complaint as true, *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S. Ct. 2229, 2232, 81 L. Ed. 2d 59 (1984), while viewing the complaint in a light most favorable to the plaintiffs, *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S. Ct. 1683, 1686, 40 L. Ed. 2d 90 (1974); *Westlake v. Lucas*, 537 F.2d 857, 858 (6th Cir. 1976). The Court is without authority to dismiss the claims unless it can be demonstrated beyond a doubt that the plaintiff can prove no set of facts that would entitle it to relief. *Conley v. Gibson*, 355

---

[1](...continued)
the duties of the General Receiver were modified, transferred and assumed by the Alpha Receiver, William T. Wuliger. (*Liberte*, Doc. No. 2243.)

U.S. 41, 45-46, 78 S. Ct. 99, 101-02, 2 L. Ed. 2d 80 (1957); *Westlake*, *supra*, at 858. *See generally* 2 JAMES W. MOORE, MOORE'S FEDERAL PRACTICE, § 12.34[1] (3d ed. 2004).

*2. Standing*

    A. Applicable Standard

The party invoking federal jurisdiction has the burden of establishing the elements of standing. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561-562 (1992). The nature of the standing doctrine encompasses both constitutional and prudential requirements. Failure to establish standing is a jurisdictional defect. *Stupak-Thrall v. Glickman,* 346 F.3d 579 (6th Cir. 2003). Moreover, standing is determined as of the date the suit is filed. *Senter v. General Motors Corp.,* 532 F.2d 511, 518 (6th Cir.) *cert. denied*, 429 U.S. 870 (1976).

With regard to the constitutional aspects, in order to meet this burden the plaintiff must establish the requirements set forth to satisfy Article III standing requirements, which require a plaintiff to show:

> "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."

*Cleveland Branch, N.A.A.C.P. v. City of Parma, Oh.,* 263 F.3d 513, 523-524 (6th Cir. 2001), *cert. denied,* 535 U.S. 971 (2002) (citations omitted).

The prudential standing considerations require the court to consider: (1) whether the alleged injury to plaintiff falls within the "zone of interests" protected by the statute or constitutional provision at issue; (2) whether the complaint raises nothing more than abstract questions amounting to generalized grievances that are more appropriately resolved by the legislative and executive branches; and (3) whether the plaintiff is asserting its own legal rights

3

and interests rather than those of a third party. *See In re Cannon III,* 277 F.3d 838, 853 (6th Cir. 2002). With this framework in mind, the Court now turns to the parties contentions.

    B. <u>Receiver History</u>

Before delving into the legal analysis as to standing, the Court deems it necessary to outline the history of the Receivership and its odyssey to this juncture. The *Liberte* case was initiated in early April 1999. On July 2, 1999, the Court approved the appointment of a receiver based upon the following conclusions of law:

> 1. There is an imminent danger that the funds managed by Capital [Fund Leasing ("CFL")] for the benefit of the investors, Liberte and Alpha will be lost, concealed, or diminished in value to the detriment of the plaintiff, the intervening plaintiff and the investors in viatical contracts.
> 2. The investors, Alpha and Liberte have no adequate remedy at law.
>
> 3. The denial of the appointment of a Receiver has the probability of causing Liberte and Alpha more harm than the appointment of a Receiver will cause the Capwill interests who oppose the appointment of a Receiver.
>
> 4. There exists the probability of success on the part of Liberte and Alpha in this action along with the strong probability of irreparable harm if the appointment of a Receiver is denied.
>
> 5. The interests of Liberte and Alpha will be served by the appointment of a Receiver.

*Liberte,* Doc. 121, p. 15.

    The judgment entry appointing the Receiver states in pertinent part:

that it is beneficial for a Receiver to be forthwith appointed as requested by Intervenors to take charge of the assets belonging to VES and CFL, to manage those assets and to see to the proper administration and, where appropriate, eventual sale of said assets and distribution to creditors in order to the legal priorities and that, in the interim, litigation among the parties to this action be stayed except upon conditions that may be set by the Court.

*Id.* Doc. No. 132. The entry further states the Receiver is "to take charge of the property of Defendants Viatical Escrow Services, LLC ("VES") and Capital Fund Leasing ("CFL")" with the overall goal of the receivership as "preserv[ing], and increas[ing] the estate for the benefit of all the creditors, investors, owners and parties to this case." *Id.* While the entry of appointment states that the Receivership is to "oversee and to administer the business and assets of VES and CFL," those actions were delineated in part as follows:

> (b) if advisable, to obtain an appraisal of some or all of the assets of VES and CFL:
> (c) to sell the assets of VES and CFL, including real property, on terms, provisions and conditions as shall be prescribed pursuant to further order of the Court;
>
> (d) to satisfy the claims of creditors, including investors and other parties, in order of legal priority;
>
> (e) to perform an accounting of VES and CFL property, including the making of recommendations to the Court regarding findings of fact and conclusions of law on claims among the parties with respect to VES and CFL.
> . . .
> (h) upon application and approval by the Court, to *institute, prosecute*, defend, intervene in, become party to, compromise or settle all such cases and proceedings as are in the Receiver's property or to carry out the terms of this Order, whether such cases and proceedings are now pending or hereafter brought by or against the Receiver in his capacity as Receiver of VES and/or CFL, against VES, or against CFL in state or federal courts or administrative agencies or other forums.

*Id.* at pp. 2-3. (Emphasis added.)

As the case against Capwill (in *Liberte*) was evolving, the federal government filed a forfeiture action against J. Richard Jamieson, Liberte Capital Group, LLC and related entities. *United States v. Jamieson,* 3:00 CV 7312 (N.D. Ohio). In the *Jamieson* action, the government sought and obtained an injunction enjoining the *Jamieson* defendants from defrauding insurance companies as well as the investors. On October 17, 2000, Victor M. Javitch, Receiver, was directed to administer the sales of non-fraudulent Liberte policies, *thereby expanding the scope of*

*the estate to cover the interests in those policies funded by the Liberte investors. Liberte*, Doc. No. 777.

It was during this period that the broad scope of the case was just beginning to emerge as the initial status reports filed by the Receiver were focused on identifying areas of inquiry necessary to assessing the state of affairs relative to the Receivership Estate. *Liberte*, Doc. Nos. 173, 236, 286, and 324. Upon delving further into the dealings of Capwill, Jamieson and related entities, it became increasingly clear that the financial havoc created by the principals (and their entities) had severe ramifications for the parties to the *Liberte* action as well as other individuals and entities associated with or having dealings with the principals or their associates. That history is set forth in the Receiver's detailed reports[2].

In the interim, the Court also adopted a settlement agreement entered into by the Receiver, existing intervening plaintiffs, defendant Capwill, and counsel for Andrew Capwill. (*Liberte*, Doc. No. 925.) The import of that order was to resolve procedural issues "including the receiver's ability to bring ancillary legal actions." *Id.* On May 31, 2002 , the Receiver's authority was further expanded "to commence litigation against the banks who participated in illegal activities of money laundering, RICO violations, negligence, and other tortious conduct which contributed to the depletion of funds from Capital Fund Leasing and Viatical Escrow Services." *Liberte*, Doc. No. 1610.

Most recently, in April 2003, the Court noted the Receiver's "efforts are necessary not only to vindicate interests within the strict confines of the entities in receivership, but in the direct

---

[2] *Liberte*, Doc. Nos. 173, 2074, 787, 887, 1002, 1102, 1212, 1306, 1358, 1436, 1547, 1657, 1741, 1838, 1916, 1985, 2030, 2069, 2259, 2278, 2331, 2377, and 2408.

and larger interest of the investors as well." *Id.*, Doc. No. 1982.  To this end, the Receiver has been "empowered to represent and pursue the interests of the investors directly." *Id.*  With that history in mind, the Court now turns to the parties' contentions.

    C.  Discussion

Federal equity receivers are appointed to take control, custody, and/or management of property involved in litigation.  It is generally recognized that a receiver may bring suit to "accomplish the objective of the suit for which he or her appointment was made, or under the specific directions of the appointing court, or pursuant to his general duties to receive, control, and manage the receivership property." 12 Wright, Miller & Marcus, Federal Practice & Procedure § 2984 (2d ed. 1997).  *See also,* 65 Am. Jur.2d Receivers § 129 (2d ed) (powers of a receiver flow from statute, court rules, orders of appointment and subsequent orders of appointing court).

In the *Liberte* case, the VES, CFL and Alpha entities are all defunct.  Additionally, both receivers operate under the Court's directive, which is generally aimed at marshaling assets for the benefit of the class/investors[3], among others.  The evolving nature of the *Liberte* action is evident from the orders regarding the Receiver's responsibilities following his initial appointment.  For example, in October 2000, the Court approved the request to allow the Receiver to take control of Liberte policies in order to maximize their worth "in the best interest of the investors." *Liberte*, Doc. No. 777.  In a settlement agreement entered into between Capwill, Liberte and Alpha (an intervening plaintiff), it was agreed that, "Victor Javitch will remain in place as the Receiver and he will continue to act on behalf of the plaintiffs, intervening plaintiff, and their investors for purposes of obtaining recovery of money and assets and to take direction of the U.S. District

---

[3] The Liberte investors were certified a class as of March 2001. *Liberte*, Doc. Nos. 991 and 992.

Courts in Akron and Toledo to enhance the economic interests of the plaintiffs, intervening plaintiffs as well as their investors with the goal of protecting the economic interests of same." *Liberte*, Doc. No. 925.

Later, due to a conflict by the General Receiver, the Alpha Receiver was "authorized to commence litigation against banks who participated in illegal activities of money laundering, RICO violations, negligence, and other tortious conduct which contributed to the depletion of funds from Capital Fund Leasing and Viatical Escrow Services." *Liberte,* Doc. No. 1610. (Emphasis added.)

Subsequently that same year, the Court granted the joint motion of the Alpha and General Receiver regarding the recovery of commissions relative to Liberte and Alpha agents/brokers. Since the claims against agents and/or brokers sounding in contract or tort arose from claims by investors, those claims were "deemed to be assets of the receivership estates" and were only to be pursued by the Receivers. *Liberte,* Doc. No. 1758. Most recently, in April 2003, the Court expanded the Receivers' responsibilities and authorized them "to represent and pursue the interests of the investors directly." *Liberte,* Doc. No. 1982.

Considering the expanding scope of the receivership estate and attendant responsibilities, it is clear that the grant of authority vested in the General Receiver is broad and encompasses the interests of the entities, Liberte, VES, CFL and the Liberte investor class. To the extent that the Receiver represents the interests of Liberte and seeks to recover those premiums on its behalf, the Plaintiff has alleged an injury in fact. Since Liberte acquired the policies, established and placed them in trust accounts, and paid the premiums thereon, Liberte has sustained a distinct and palpable injury. *See Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206 (1974) ("plaintiff

8

still must allege a distinct and palpable injury to himself, even if it is an injury shared by a large class of other possible litigants").

Next, turning to whether a causal connection exists between the injury and conduct complained of, the complaint alleges the Defendant is not lawfully entitled to the premium payments as the policies were secured through fraudulent representations and that those premiums were paid with investor monies. Transamerica contends Liberte's participation in the "loss" was created as a result of its own conduct. This raises the issue of the Receiver's ability to pursue claims upon the doctrine of *in pari delicto*[4], insofar as Liberte's principal, J. Richard Jamieson, was involved in the fraud perpetrated upon the both the investors and the insurer.

Actions by equity receivers against third parties are viable where the "wrongdoer" has been removed. For example, in *Scholes v. Lehman,* 56 F.3d 750, 754-755 (7th Cir.), *cert. denied sub. nom, African Enterprise Inc. v. Scholes*, 516 U.S. 1029 (1995), Judge Posner provided this explanation:

> Though injured by the [corporate agent] Douglas, the corporations would not be heard to complain as long as they were controlled by him, not only because he would not permit them to complain but also because of their deep, their utter, complicity in Douglas's fraud. . . But the reason, of course, . . . is that the wrongdoer must not be allowed to profit from his wrong by recovering property that he had parted with in order to thwart his creditors. That reason falls out now that Douglas has been ousted from control of and beneficial interest in the corporations. The appointment of the receiver removed the wrongdoer from the scene. The corporations were no more Douglas's evil zombies. Freed from his spell they became entitled to the return of the moneys--for the benefit not of Douglas but of innocent [creditors]--that Douglas had made the corporations divert to unauthorized purposes. That the return would benefit the [creditors] is just to say that anything that helps a corporation helps those who have claims against its

---

[4] In equal fault, equally culpable or criminal; in a case of equal fault or guilt. BLACK'S LAW DICTIONARY 791 (6th ed. 1990).

>
> assets.  The important thing is that the [creditors] were not complicit in Douglas's fraud; they were its victims.
>
> Put differently, the defense of *in Parti Delicto* loses its sting when the person who is *in Parti Delicto* is eliminated.  Now that the corporations created and initially controlled by Douglas are controlled by a receiver whose only object is to maximize the value of the corporations for the benefit of their . . . creditors, we cannot see an objections to the receiver's bringing suit to recover corporate assets unlawfully dissipated by Douglas.

*See also, McCandless v. Furland,* 296 U.S. 140, 56 S.Ct. 304, 80 L.Ed. 473 (1935) (participation by debtor's management or agents in wrongful conduct does not bar a receiver's action under the doctrine of *in parti delicto*).

Even in the context of a bankruptcy dispute, the imputation of wrongdoing to an innocent successor estate does not comport with the equitable doctrine of *in pari delicto*:

> A receiver, like a bankruptcy trustee and unlike a normal successor in interest, does not voluntarily step into the shoes of the [debtor]; it is thrust into those shoes.  It was neither a party to the original inequitable conduct nor is it in a position to take action prior to assuming the [debtor]'s assets to cure any associated defects. . . In light of these considerations we conclude that the equities between a party asserting an equitable defense and a [debtor] are at such variance with the equities between a party and a receiver of the [debtor] that equitable defenses good against the [debtor] should not be available against the receiver.  To hold otherwise would be to elevate form over substance--something courts sitting in equity traditionally will not do. . . [T]he [debtor']s inequitable conduct is not imputed to [a receiver].

*F.D.I.C. v. O'Melveny & Myers,* 61 F.3d 17, 19 (9th Cir. 1995).  *See also Official Committee of Unsecured Creditors v. R.F. Laferty & Co.,* 267 F.3d 340, 358 (3d Cir. 2001).

More recently, a subsidiary's receiver's suit against the parent and its officers was allowed to proceed despite the claim that the doctrine of *in pari delicto* barred the suit.  *DeNune v. Consolidated Capital of North America, Inc.,* 288 F.Supp.2d 844 (N.D. Ohio 2003) (Carr, J.).

An equity receiver's duties are fashioned and may be modified by the appointing court. Because this Court has expressly given the Receiver's broad authority to pursue claims on behalf

10

of Liberte and the investors, the Receiver is not precluded from these actions under the doctrine of *in pari delicto*.

Finally, the redressability component does not require it be established beyond question that a favorable judgment would redress the injury. It must be demonstrated that the plaintiff is likely to benefit from requested relief or has a probabilistic benefit from prevailing in the litigation. *See Family & Children's Ctr, Inc. v. School City of Mishawaka*, 13 F.3d 1052, 1058 (7th Cir.), *cert. denied,* 513 U.S. 961 (1994). In this case, assuming a favorable outcome on behalf of the Plaintiff, the Receivership estate will undoubtedly benefit from a return of the premiums which would fulfill the Receiver's role in marshaling of assets.

Accordingly, the first and fourth branches of Defendant's motion to dismiss are without merit.

*3. Lack of Insurable Interest*

Defendant Transamerica contends that only the insurer may raise the issue of a lack of an insurable interest. This is presumably because of the following contained in the Complaint:

> At the time he fraudulently completed the application, Allan had no intent to own the life insurance policy or to make policy premiums payments on the policy for which he was applying; rather, he intended to procure the policy for the sole purpose of selling and assigning it, immediately upon issuance, to a viatical company, Liberte Capital, which had no insurable interest in Allan's life. . .
>
> As a result of the fraud and the lack of insurable interest when the policy was procured and then immediately sold by Allan, the rules associated with insuring Allan never attached to Transamerica, so Transamerica has been unjustly enriched through the premium payments with funds obtained from the investors because it assumed no risk with regard to the policy.

(Compl. at ¶¶26 and 29.) This action is not one involving the collection of insurance proceeds, therefore, the assertion of a lack of an insurable interest is of little moment as generally the extent

of an insurable interest and the right to insurance proceeds is determined at the time of the loss. The cases cited by Transamerica support this proposition since all of them involve claims to the proceeds of insurance policies. As the complaint does not seek proceeds of the policies but rather rescission, Defendant's argument is not well taken.

*4. Unjust Enrichment*

As correctly noted by the parties, an action for unjust enrichment may be made "when a party retains money or benefits which in justice and equity belong to another." *Liberty Mutual Ins. Co. v. Indus. Comm.,* 40 Ohio St.3d 109, 110-111, 532 N.E.2d 124, 125 (1988) (citations omitted). In order to assert a claim of unjust enrichment, the movant must establish the following elements:

> (1) the plaintiff conferred a benefit on the defendant; (2) the defendant had knowledge of the benefit; and (3) the defendant retained the benefit under circumstances where it would be unjust for him to retain that benefit without payment.

*Hambleton v. R.G. Barry Corp.,* 12 Ohio St.3d 179, 183, 465 N.E.2d 1298, 1302 (1984).

In this instance, the complaint alleges Transamerica received premium payments on void policies from Liberte, which entity utilized investor funds to make those premium payments. Transamerica was advised of the assignment of ownership and beneficiary rights in October 1998. As the policy owner, Liberte made the premium payments. In Transamerica's view the complaint fails to state a claim because there is no allegation of the Defendant's refusal to honor the policies. However, the Defendant's argument misapprehends the argument for rescission.

> The purpose of insurance is to protect individuals . . . by permitting them to contract with insurance carriers. The carriers calculate and distribute the risks and liabilities and set premiums.

12

*N. Buckeye Edn. Council Group Health Benefits Plan v. Lawson*, 154 Ohio App.3d 659, 798 N.E.2d 667 (2003). By accepting the premiums and issuing a policy, the insurer accepts the risk. Assuming the allegations of fraud to be true, Transamerica never truly assumed that risk but continued to accept premiums on a void policy. Transamerica also knew Liberte was making the premium payments as it had notice of the assignment and change of beneficiary. Taking the factual allegations as true, the pleadings are sufficient to withstand dismissal under Fed. R. Civ. P. 12(b)(6). Finally, the allegation that Transamerica never rescinded, disavowed, or refused to honor any of the contested policies is irrelevant as there is clearly a dispute between the parties as is evident by the existence of this lawsuit.

## CONCLUSION

For the reasons stated above, Defendant's motion to dismiss (Doc. No. 21) is denied. A telephonic status conference to set new deadlines is scheduled for January 20, 2006 at 2:00 p.m.

IT IS SO ORDERED.

                                                     S/ *David A. Katz*
                                                     DAVID A. KATZ
                                                     SENIOR U. S. DISTRICT JUDGE

.